IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Hospital Internists of Austin, P.A. and Hospital Internists of Texas, | § § | |
| | § | Civil Action No. 1:18-cv-00-466 |
| Plaintiffs, | § | |
| | § | JURY DEMANDED |
| v. | § | |
| | § | |
| Quantum Plus, LLC d/b/a TeamHealth Hospital Medicine West and Team Health, LLC | § § § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs Hospital Internists of Austin, P.A. and Hospital Internists of Texas file this Original Complaint and Request for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 *et seq.* complaining of Defendant Quantum Plus, LLC (f/k/a Quantum Plus, Inc.) d/b/a TeamHealth Hospital Medicine West Team Health, LLC and would respectfully show as follows:

## I. INTRODUCTION

1. Defendants are in the business of providing medical staffing services to hospitals, including providing hospitals with emergency room physicians and hospitalists. To ensure such they have sufficient medical staff for their hospital clients, Defendants either acquire emergency and hospitalist groups or enter into supposed independent contracts with them. Defendants entered into an independent contract with Plaintiff Hospital Internists of Austin (which later subcontracted with Plaintiff Texas Hospitalists of Texas); however, during the performance of the contract, Defendants began to and continue to exert control over the hospitalists' practice of

medicine in violation of the Texas corporate practice of medicine prohibition. Plaintiffs seek to have the contract declared void due to such unlawful performance. In the alternative, Plaintiffs assert breach of contract claims for breach of the Removal, Compliance, Compensation, and Noninterference provisions in the contract. Additionally, Defendants have tortuously interfered with Plaintiffs' existing contracts and prospective relationships. TeamHealth's conduct is the proximate cause of economic and non-economic damages sustained by Plaintiffs, including the loss of business relationships, damage to Plaintiffs' business reputation, and loss of profits.

## II. PARTIES

2. Plaintiff Hospital Internists of Austin, P.A. is a Texas professional association with its principal place of business located within this judicial district, at 7000 North Mopac Expressway, Suite 420, Austin, Texas 78731.

3. Plaintiff Hospital Internists of Texas is a nonprofit corporation organized under the Texas Nonprofit Corporation Act and certified as a nonprofit health organization under the Texas Medical Practice Act, Tex. Occ. Code §162.001(b). Its principal place of business is located within this judicial district, at 7000 North Mopac Expressway, Suite 420, Austin, Texas 78731.

4. Defendant Quantum Plus, LLC (f/k/a Quantum Plus, Inc.) d/b/a TeamHealth Hospital Medicine West is a foreign limited liability company organized and existing under the laws of the State of California, with its principal place of business in California. TeamHealth is authorized to do business in Texas, and routinely conducts business within the Western District of Texas. TeamHealth may be served with process by serving its registered agent for service in Travis County: Corporation Service Company d/b/a CSC–Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

5. Defendant Team Health, LLC (f/k/a Team Health, Inc.) is a for-profit foreign corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Tennessee. Team Health, LLC routinely conducts business in Texas but has not designated or maintained a resident agent for service of process in Texas. Pursuant to TEX. CIV. PRAC. & REM. CODE §§17.044(a)(1), 17.045, Team Health, LLC may be properly served with process by serving the Texas Secretary of State, at 1019 Brazos, Austin, Texas 78701. FED. R. CIV. P. 4(e)(1), 4(h)(1)(A).

## III. JURISDICTION & VENUE

6. This Court has subject-matter jurisdiction over Plaintiffs' claims because there is complete diversity of citizenship between the parties and more than $75,000 in controversy. 28 U.S.C. § 1332(a)(1).

7. This Court has personal jurisdiction over Defendants, foreign business entities, because Defendants enter into contracts, provide services, and routinely solicit and conduct business in the Western District of Texas. Additionally, the contract giving rise to Plaintiffs' claims was performed by in the Western District of Texas.

8. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2), because the contract that made the basis of this action was executed in this district and all or a substantial part of the events or omissions giving rise to these claims occurred in the district.

## IV. FACTS

### *A. Background*

9. Hospital Internists of Austin, P.A. is a physician-owned and physician-managed group that was founded in 1996. Over the next 20 years it grew to become the largest privately held hospitalist group in Austin with approximately 60 hospital medicine specialists. Among

others, Hospital Internists of Austin, P.A. historically served all of the St. David's Healthcare Partnership, LP facilities in Austin and Georgetown (St. David's Medical Center, North Austin Medical Center, South Austin Medical Center, Heart Hospital of Austin, and St. David's Georgetown Hospital).

10. In 2017, Hospital Internists of Texas was formed, and through a Professional Services Subcontract Agreement dated June 1, 2017 it began providing certain professional medical services on behalf of Hospital Internists of Austin, P.A., including services relevant to this case. Hereafter, Hospital Internists of Austin, P.A. and Hospital Internists of Texas are collectively referred to as "HIA."

11. Defendants are affiliates and/or subsidiaries of Team Health Holdings, Inc. Team Health Holdings, Inc., through its various affiliates and subsidiaries, is a provider of outsourced physician staffing solutions for about one-fifth of the hospitals across the country. Team Health Holdings, Inc., along with its affiliates and subsidiaries, are collectively known as "TeamHealth." TeamHealth specializes in professional emergency department and hospitalist program services. To ensure it has the right talent to fulfill its duties with new hospital clients, TeamHealth acquires key physician groups in the market. Alternatively, TeamHealth secures independent contractor service agreements. TeamHealth boasts its ability to help hospitals cut costs and allow physicians to focus on delivering care.

***B. Texas Law Prohibits the Corporate Practice of Medicine***

12. Many states have historically prohibited what is commonly known as the "corporate practice of medicine" or "CPOM." The CPOM prohibition precludes a business corporation from practicing medicine or employing a physician to provide professional medical services. The rationale is that corporations practicing medicine tend to commercialize and

undermine the physician-patient relationship and invade the physician's exercise of independent medical judgment, which should be in the sole interest of the patient. The practical effect of the restrictions on the corporate practice of medicine has been eroded in many jurisdictions over the years; however, Texas is one of the states that continues to maintain a broad prohibition against the CPOM with only limited statutory exceptions for certain physician employment arrangements, such as for professional associations and nonprofit health organizations.

13. In Texas, the CPOM prohibition is codified in the Texas Medical Practice Act, TEX. OCC. CODE §151.001 *et seq.*, which prohibits non-licensed persons or entities from practicing medicine,[1] employing physicians, assisting in the unlicensed practice of medicine, sharing professional fees with licensed physicians, or otherwise engaging in the CPOM. Violation of the CPOM prohibition carries risk of both civil and criminal penalties. *See* TEX. OCC. CODE §§ 165.001–165.160.

***C. TeamHealth's Entrance into the Central Texas Market***

14. In 2014-2015, TeamHealth entered the central Texas market and ultimately entered into an exclusive Professional Services Agreement with St. David's Healthcare Partnership, LP d/b/a St. David's Round Rock Medical Center, St. David's North Austin Medical Center, St. David's South Austin Medical Center, St. David's Georgetown, Heart Hospital of Austin, and St. David's Medical Center ("St. David's PSA").

15. Under its exclusive St. David's PSA, effective February 1, 2015, TeamHealth agreed to provide services of emergency medicine and hospitalist medicine services to the St. David's facilities. With the St. David's hospitalist PSA, TeamHealth became responsible for running the St. David's hospitalist program, and was charged with: directing and supervising the

---

[1] Practicing medicine is defined in §151.002(13) to include the diagnosis, treatment, or offer to treat a disease, deformity, or injury by any system or method.

hospitalist services; serving as a liaison for the facilities' CEOs; conducting recruiting/orientation of hospitalists; actively leading and participating in the facilities' hospitalist committees; leading and participating in quality improvement/peer review of the hospitalist services; and facilitating and participating in regulatory compliance, professional education, planning, budgeting, and risk management as those items pertain to the hospitalist services.

16. While negotiating the terms of its exclusive St. David's PSA, TeamHealth simultaneously negotiated with local hospitalist groups to secure the workforce needed to fulfill its anticipated contract with St. David's. Specifically, TeamHealth or its affiliates or related entities negotiated an acquisition of Central Texas Hospitalists, P.A., a hospital medicine practice group that has historically served St. David's Round Rock Medical Center;[2] and the Services Agreement with HIA, which has historically served other St. David's facilities in Austin.

17. TeamHealth initially wanted to acquire HIA, which was TeamHealth's preference and standard practice when entering new markets. HIA dismissed the option because it presented too much risk of compromising its physicians' independence. However, because St. David's made clear its intention to start using TeamHealth for hospitalist services, HIA had no choice but to negotiate a Services Agreement with TeamHealth if it wanted to continue serving patients at the noted St. David's facilities where its physicians worked historically. HIA also believed that a subcontractor arrangement preserved an appropriate arm's length relationship with TeamHealth and would permit continued independence.

---

[2] Central Texas Hospitalist, P.A. sued Quantum Plus, LLC and TeamHealth, Inc. for breach of the purchase agreement, breach of a guaranty, and tortious interference. *See Central Texas Hospitalists, P.A. v. Lonestar Hospital Medicine Associates, P.A., et al.,* Cause No. D-1-GN-16-000741 pending in the 98th District Court of Travis County, Texas.

18. St. David's is highly incentivized to use TeamHealth. By using a staffing company such as TeamHealth, St. David's controls its costs by foregoing payment of a stipend for hospitalist coverage, which it must have in steady supply to fully comply with the Emergency Medical Treatment and Labor Act (EMTALA).[3] Hospitalist stipends can run St. David's more than $80,000 per hospitalist.

19. St. David's expects TeamHealth to deliver additional cost-cutting (and revenue-enhancing) measures. In this sense and as explained below, St. David's uses TeamHealth to do indirectly what it could not do directly—implement a scheme of corporate governance over physicians to manipulate their medical practice to save St. David's money and remove physicians that St. David's determined cost it too much money.

***D. TeamHealth's Services Agreement with HIA***

20. As a consequence of the above-referenced pressures and not knowing that TeamHealth would unlawfully perform an agreement and ignore the "independent contractors" relationship, HIA entered into a Services Agreement with TeamHealth on January 1, 2015. The parties amended the Services Agreement on June 1, 2016 ("First Amendment") and again September 1, 2016 ("Second Amendment").

21. The Services Agreement on its face appeared valid, but in practice and performance, TeamHealth began to exert unlawful control over the hospitalists' practice of medicine. The control became more clear and increased after TeamHealth acquired Central Texas Hospitalists, P.A. who were serving St. David's Round Rock facility. TeamHealth has

---

3 All hospital emergency departments, including those of St. David's, are required to comply with the EMTALA, which mandates that all patients presenting to the ED regardless of insurance status, receive a medical screening examination and be medically stable prior to transfer to another facility. To address these requirements, every hospital with an ED must have physicians on call to assist emergency physicians in assessing and treating unassigned patients.

exerted such unlawful control at the behest of, in conjunction with, and/or with the consent of its client, St. David's Healthcare Partnership, LP.

22. TeamHealth is not new to Texas or to the CPOM prohibition. Indeed, based at the least on prior litigation,[4] TeamHealth and its affiliates are acutely aware that the CPOM prohibition is enforced in Texas, though its Chief Operations Counsel considers it an "arcane law we call corporate practice of medicine that nobody needs."[5] True to that apparent belief, and as explained herein, TeamHealth is violating the CPOM prohibition in practice and in the execution of the contract with HIA.

### *E. Breach of Promise to Comply in All Respects With Applicable State Statutes, Rules, and Regulations: Violation of the CPOM Prohibition*

23. TeamHealth promised in Section 24 of the Services Agreement to comply in all respects with applicable federal, state and local statutes, rules and regulations. Despite this promise and the clear prohibition against CPOM in Texas, TeamHealth engaged in the actions described below. TeamHealth did so at the behest of, in conjunction with, and/or with the consent of its client, St. David's Healthcare Partnership, LP. While any one act alone may not constitute a CPOM violation, taken together TeamHealth crossed the line.

#### *E.1. Hiring Physicians, Staffing Decisions, Invading the Exercise of Hospitalists' Independent Medical Judgment, and Firing Physicians*

24. The Services Agreement provides in Section 2.1 that HIA has the "sole authority and obligation" to select, recruit, hire" the physicians needed to meet the St. David's PSA as to the hospitalist medicine program and to determine necessary staffing levels in collaboration with

---

4 *See generally Cassidy v. TeamHealth, Inc.*, No. 01-08-00324-CV, 2009 WL 2231217 (Tex. App.—Houston [1st Dist.] July 23, 2009, pet. denied) (mem. op.); *American Academy Emer. V. Mem'l Hermann Healthcare Sys., Inc.*, 285 S.W.3d 35 (Tex. App.—Houston [1st Dist.] 2009).

5 Deposition of TeamHealth's Chief Operations Counsel filed in support of TeamHealth's motion for summary judgment in *Central Texas Hospitalists, P.A. v. Lonestar Hospital Medicine Associates, P.A., et al.,* Cause No. D-1-GN-16-000741 pending in the 98th District Court of Travis County, Texas.

TeamHealth. However, throughout the term of the Services Agreement, TeamHealth unlawfully exercised control over the hiring and retention of HIA hospitalists and unilaterally dictated medical staffing needs at the Covered Hospitals. For instance:

a. On multiple occasions TeamHealth and St. David's instructed HIA not to hire physicians whom HIA was recruiting;

b. In approximately August 2015 when HIA began transitioning its hospitalists' schedule (from a Monday-Friday and every other weekend schedule to a seven days on/seven days off schedule) and needed to add the total of full time equivalent hospitalists to its staff, TeamHealth instructed HIA not to over hire; and

c. When HIA was paid primarily by the hour, TeamHealth routinely instructed HIA it was "overstaffed" or "understaffed" and demanded adjustments accordingly. The Services Agreement's Exhibit A stated an expected average staffing rate of 15 to 18 patient encounters per 12 hour shift, but TeamHealth would actually instruct HIA it was overstaffed if average daily encounters were fewer than 18 per physician per shift.

25. Attempts to control HIA and its physicians did not stop with hiring practices. In approximately late 2015 TeamHealth instructed that the HIA hospitalists would have to start running the emergency codes on overnight shifts at St. David's South Austin Medical Center which was transitioning to a Level II trauma facility. The understood rationale was that a facility just getting started with Level II trauma services could not financially justify the high cost of having emergency department physicians on the overnight shift. HIA vehemently refused because in its judgment it is perilous for hospitalists, the least qualified specialty to run codes (since patients deserve the most proficient provider in emergent situations such as a code or respiratory failure), and most especially not medically appropriate to run pediatric codes. Because TeamHealth's staffing instructions were such an obvious overreach and violation of the CPOM (and an issue they were already fighting at St. David's Round Rock), TeamHealth did not press the issue further. Nevertheless, this cost-driven staffing directive demonstrates how

TeamHealth ignored the CPOM prohibition, all in an effort to serve the cost and profit goals of St. David's.

26. TeamHealth's encroachment into the hospitalists' medical judgment occurred in other ways as well. For instance, during the 2016-2017 winter months (when hospitals are often stressed with maximum patient loads), a St. David's data/administrative employee would routinely email to TeamHealth a list of patients that he had determined were ready for discharge. The TeamHealth employee would forward that email to HIA's contact physician and insist that action be taken to discharge the patients on the list. HIA determined the bases for these requests: if the actual length of the patient's stay was exceeding the Medicare geometic mean or average length of stay for the particular patient's diagnosis then St. David's and TeamHealth were demanding the hospitalists discharge the patient. This blatant infringement into the practice of medicine is yet another example of TeamHealth's violation of CPOM at the behest of St. David's.

27. In conjunction with St. David's, TeamHealth also unlawfully exercised control over HIA's firing of its hospitalists. Paragraph 6 of the Services Agreement provides that TeamHealth may with reasonable advanced notice, discussion with HIA, and opportunity for HIA to cure "remove from service under this [Services Agreement]" any HIA physician deemed unsuitable for performance by a St. David's facility, but TeamHealth ignored these details and allowed St. David's to dictate termination and threaten termination of physicians who cost St. David's too much money, even though the foundation of such cost is—in the hospitalists' view—in the best medical interest of their patients. For example, as outlined in a December 21, 2017 cease and desist letter from HIA:

      a. On December 4, 2017 TeamHealth mandated in writing HIA's removal of Dr. Paturu from St. David's Medical Center due to his patient length of stays being too long and "costing St. David's too much money," when length of stay is solely a medical judgment; and

b. TeamHealth also threatened removal of two additional hospitalists, Drs. Ayaz and Brittain, from St. David's Medical Center for the same reason if the lengths of stay of those physicians' patients were not reduced to save St. David's money.

By engaging in these actions, TeamHealth was invading the exercise of independent medical judgment and effectively carrying out St. David's unlawful economic credentialing practices.

### *E.2. Charge and Collect All Fees for Doctors, Fee-Splitting, and Collecting Majority of Profits*

28. In addition to exercising unlawful control over HIA's hiring and firing of its physicians, TeamHealth also entirely controls every aspect of the physician fees. This control alone as outlined in the Services Agreement did not necessarily appear nefarious, but the manner in which TeamHealth executes its billing responsibilities violates the CPOM prohibition because it allows TeamHealth to conceal unlawful fee-splitting and collection of the majority if not all of the profits from the physician services fees.

29. Section 3 of the Services Agreement permits TeamHealth to:

- set the schedule of fees charged for the professional services furnished;
- collect the fees for HIA services;
- negotiate managed care arrangements on behalf of the physician;
- procure requisite billing and payment authorization and enrollment numbers from applicable third-party payers;
- assume responsibility for billing patients, guarantors, and responsible parties or third party insurance carriers directly;
- independently code, bill, collect, and retain, the fees for the hospitalist services provided in the St. David's hospital medicine programs;
- own as its "sole and exclusive property" the Accounts Receivable and the Collections.

This control was balanced out in the Services Agreement by TeamHealth's promises to provide HIA "agreed upon" monthly billing and collection data as requested and a complete listing of all

required professional documentation necessary for HIA to begin services under the Services Agreement to the St. David's facilities. HIA made repeated requests for billing and collection data and for the documentation material, which TeamHealth denied and delayed.

30. TeamHealth breaches of its promises in this regard served to:

a. conceal the fact that TeamHealth ignored entirely the HIA hospitalists' coding of their professional services, using it only to track physician productivity and not for billing;

b. on information and belief, allowed TeamHealth to increase the average billing for HIA's services (above what the physicians' coding alone would have yielded) and conceal the fact that it is therefore necessarily splitting a physician fee with HIA;

c. on information and belief, allowed TeamHealth to conceal the fact that they are likely splitting fees (and causing HIA to unknowingly split fees) with the emergency physician services that TeamHealth also provides under the St. David's PSA; and

d. on information and belief, allowed TeamHealth to collect a majority of the profits generated by HIA's professional fees of HIA, particularly in conjunction with not reimbursing HIA for Total Costs Incurred as provided in Section 4 of the Services Agreement. Total Costs Incurred can include costs such as recruiter fees and costs associated with securing locum tenens providers.

***F. Noninterference***

31. As HIA resisted TeamHealth's attempt to control the hospitalists' practice of medicine as described above, TeamHealth began systematically drawing a wedge between HIA and its physicians, in part by soliciting HIA physicians indirectly through TeamHealth's subsidiary-recruiting company.

32. The Services Agreement contains a noninterference provision in Section 8:

> (b) Noninterference. During the term of this Agreement, the parties agree that they shall not perform any of the following prohibited activities with respect to the other party's business activities: (i) solicit or hire any person or entity who is then, or during the term of this Agreement was, an employee or contractor (including contract physicians) of the other party; and (ii) solicit, induce, or attempt to induce any person or entity (including, but not limited to, any hospitals) doing business with the other party to terminate such relationship or engage in any other activity detrimental to the other party's business.

33. In mid-2017, HIA heard TeamHealth was soliciting its hospitalists to join TeamHealth. Not knowing for certain whether these were rumors but wanting to be vigilant, HIA reminded TeamHealth of the noninterference clause in the Services Agreement and advised TeamHealth to cease any such solicitations and interference.

34. In approximately January-February 2018, HIA learned that TeamHealth representatives had been contacting HIA hospitalists to solicit, encourage, and/or induce those physicians to leave HIA to work for TeamHealth. TeamHealth directly or indirectly engaged in such actions despite being advised that HIA's employees and contractors are subject to applicable non-competition restrictive covenants. HIA also learned that TeamHealth began recruiting 60-70 locums hospitalists in and to the Austin area, presumably to work at the very facilities HIA covers through the Services Agreement with TeamHealth. HIA sent TeamHealth a cease and desist letter to this effect on February 1, 2018.

***G. Termination of the Services Agreement and Continued Control***

35. TeamHeath's conduct caused the relationship between HIA and TeamHealth to deteriorate. On February 1, 2018, HIA was compelled to send a cease and desist letter to TeamHealth advising that its conduct was in breach of the noninterference provision of the Services Agreement. On information and belief, TeamHealth did not cease its offensive and predatory conduct.

36. Given the untenable relationship and the commensurate risk to HIA physicians, on February 8, 2018, HIA gave notice of termination of the Services Agreement, effective June 8, 2018, and files this suit for damages and injunctive relief.

37. Subsequently, in late March 2018, TeamHealth made it clear that TeamHealth had been accessing HIA's billing and medical record documentation for assigned patients that are

outside of the services covered by the Services Agreement. HIA provided written notice to TeamHealth that such conduct at the very least violates the Health Insurance Portability and Accountability Act ("HIPAA").

### *H. Total Costs Incurred*

38. The Services Agreement provides that TeamHealth shall reimburse HIA for its Total Costs Incurred in fulfillment of its obligations to TeamHealth prior to June 2016. TeamHealth has failed to pay and failed to confirm that it will make payment of $2,626,810 in Total Costs Incurred for recruiting commissions, locums retentions, and contract labor costs.

## V. CAUSES OF ACTION

### COUNT ONE: REQUEST FOR DECLARATORY JUDGMENT

39. Plaintiffs hereby incorporates paragraphs 1 through 38 the same as if fully set forth verbatim herein.

40. TeamHealth's performance of the Services Agreement—exercising control over physician hiring, staffing, and firing; the invasion of medical judgment regarding the timing of patient discharges from St. David's facilities and the directive to run codes on the overnight shift at one of the facilities; comprehensive control over billing and collection; fee-splitting; and collection of the majority of profits—has collectively resulted in the corporate practice of medicine in violation of the Texas Medical Practice Act, as codified at TEX. OCC. CODE §151.001 *et seq.*

41. Together, these unlawful actions exceeded what the Services Agreement contemplated and constituted the prohibited CPOM, depriving the HIA physicians of their unfettered ability to diagnose and treat patients using their own independent medical judgment.

TeamHealth's conduct created a substantial controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory action from this Honorable Court.

42. At all times mentioned herein, TeamHealth was not licensed to practice medicine in Texas and may not permissibly exercise control, directly or indirectly, over a medical practice or enter into arrangements that are tantamount to the unlicensed practice of medicine.

43. HIA brings this cause of action pursuant to 28 U.S.C. § 2201 *et seq*. and seeks a declaration from the Court that in performance of the Services Agreement TeamHealth engaged in conduct that was in violation of the Texas Medical Practice Act's prohibition of the Corporate Practice of Medicine, as codified at TEX. OCC. CODE §151.001 *et seq.*, rendering the contract as performed illegal and void.

**COUNT TWO (IN THE ALTERNATIVE): BREACH OF CONTRACT**

44. Plaintiffs hereby incorporate paragraphs 1 through 43 the same as if fully set forth verbatim herein.

45. HIA is a party to a valid and enforceable contract with TeamHealth.

46. HIA fully or substantially performed its obligations under the Services Agreement by providing high quality medical care to patients at the noted St. David's facilities throughout the term of the Services Agreement.

47. TeamHealth interfered with HIA's obligations and rights under the Service Agreement to select, hire, and contract with physicians. TeamHealth also demanded removal of physicians from the Services Agreement for reasons outside those listed in the Removal Provision and in any event without notice or an opportunity to cure. TeamHealth's failures constitute a material breach of its obligations as set forth in the Removal Provision of the Services Agreement.

48. TeamHealth's performance of the Services Agreement—exercising control over physician hiring, staffing, and firing; the invasion of medical judgment regarding the timing of patient discharges from St. David's facilities and the directive to run codes on the overnight shift at one of the facilities; comprehensive control over billing and collection; fee-splitting; and collection of the majority of profits—has collectively resulted in the corporate practice of medicine in violation of the Texas Medical Practice Act, as codified at TEX. OCC. CODE §151.001 *et seq.* TeamHealth's conduct represents a failure to comply in all respects with applicable federal, state, and local statutes, rules and regulations, and therefore constitutes a material breach of its obligations set forth in the Compliance with Government Laws and Regulations Provision of the Services Agreement.

49. TeamHealth has failed to compensate and failed to confirm that it will compensate HIA for Total Costs Incurred related to the performance of the HIA's obligations under the Services Agreement. TeamHealth's failure constitutes a material breach of its obligations as set forth in the Compensation Provision of the Services Agreement with HIA.

50. As a proximate result of TeamHealth's breach, HIA sustained actual damages that were a natural, probable, and foreseeable consequence of the breaches. HIA is entitled to all foreseeable damages resulting from TeamHealth's material breaches of the Services Agreement, including actual damages.

**COUNT THREE: CONSPIRACY**

51. Plaintiffs hereby incorporate paragraphs 1 through 50 the same as if fully set forth verbatim herein.

52. TeamHealth was a member of a combination of two or more business entities that included St. David's. The object of the combination was to accomplish a lawful purpose by

unlawful means, specifically to control St. David's costs and improve its profits by exerting unlawful control over the HIA physicians' practice of medicine.

53. TeamHealth and St. David's had knowledge of the object of the conspiracy from its inception and there was a tacit agreement to enter into the conspiracy.

54. The parties' knowledge of and agreement to the conspiracy constituted a meeting of the minds between TeamHealth and St. David's as to the object of the conspiracy and the conspiratorial course of action.

55. In furtherance of the conspiracy, TeamHealth exerted unlawful control over HIA's staffing, hiring and firing, and practice of medicine as detailed herein. TeamHealth's unlawful, overt act furthered the object of the conspiracy and was part of the conspiratorial course of action.

56. As a result of the conspiracy, HIA suffered economic damages, including the continuation of a lawful agreement with TeamHealth, which is the only current means through which HIA can provide services to unassigned patients at the St. David's facilities, as well as past and future noneconomic damages reasonably expected to result from the unlawful control of their practice.

**COUNT FOUR: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS**

57. Plaintiffs hereby incorporate paragraphs 1 through 56 the same as if fully set forth verbatim herein.

58. HIA's physician employees and contractors are subject to a non-competition restrictive covenant which prohibits them from working, for a period of one (1) year following the termination of their employment agreements, as a hospitalist at any facility in which HIA provides services, and precludes them for working for TeamHealth or its affiliates in Travis,

Williamson and Hays counties, for the same period. TeamHealth is on notice that these noncompete agreements are in place.

59.     Additionally, Section 8(b) of the Service Agreement prohibits TeamHealth from soliciting, inducing, or attempting to induce any person or entity doing business with HIA to terminate such relationship or engage in any activity that will cause substantial and irreparable harm to the other party's business." TeamHealth directly or indirectly engaged in such actions despite being advised that HIA's employees and contractors are subject to applicable non-competition restrictive covenants. TeamHealth also began recruiting 60-70 locums hospitalists in and to the Austin area, presumably to work at the very facilities HIA covers through the Services Agreement with TeamHealth.

60.     TeamHealth willfully and intentionally interfered with the continuing relationships between HIA and their physicians by soliciting doctors from HIA.

61.     At all times relevant hereto, TeamHealth acted intentionally, with malice, and with the specific purpose of interfering with HIA's contracts with its employees and contractors. TeamHealth's intentional and tortious interference entitles HIA to recovery of exemplary damages.

62.     HIA sustained actual damages as a result of TeamHealth's conduct, including at least the cost and distraction from ordinary business, of obtaining legal advice, and sending cease and desist notice.

## VI.  CONDITIONS PRECEDENT

63. All conditions precedent have been performed, excused, waived, or otherwise satisfied.

## VII.  ATTORNEY'S FEES

64. Plaintiff hereby incorporates paragraphs 1 through 63 the same as if fully set forth verbatim herein.

65. Pursuant to TEX. CIV. PRAC. & REM. CODE §37.009 and §38.001, *et seq.*, Plaintiff is entitled to recovery of its reasonable and necessary attorney's fees. Plaintiff respectfully requests that the Court award Plaintiff its costs and reasonable and necessary attorneys' fees expended in this matter.

## VIII.  JURY DEMAND

66. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby request a trial by jury on the merits.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Defendant be cited to appear and answer and that upon final hearing, a judgment be entered in favor of Plaintiffs declaring the rights, and legal relations of the parties as set forth above, awarding Plaintiffs actual damages, exemplary damages, pre and post-judgment interest at the maximum permissible rate at law or in equity, its costs of court and reasonable and necessary attorneys' fees incurred or the preparation and trial of this case and for any appeal, and such other and further relief to which it may show itself justly entitled.

Respectfully submitted,

By: */s/ Lorinda Holloway*

Lorinda Holloway
State Bar No. 00798264
lorinda.holloway@huschblackwell.com
Kevin Koronka
State Bar No. 24047422
Kevin.Koronka@HuschBlackwell.com
Danielle Gilbert
State Bar No. 24092421
Danielle.Gilbert@HuschBlackwell.com

HUSCH BLACKWELL, LLP
One Congress Plaza
111 Congress Avenue, Suite 1400
Austin, Texas 78701-4093
Telephone: (512) 472-5456
Telecopier: (512) 479-1101

**ATTORNEYS FOR PLAINTIFFS**