IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Hospital Internists of Austin, P.A. and | § | |
| Hospital Internists of Texas, | § | |
| | § | Civil Action No. 1:18-cv-00-466 |
| Plaintiffs, | § | |
| | § | JURY DEMANDED |
| v. | § | |
| | § | |
| Quantum Plus, LLC d/b/a TeamHealth West | § | |
| and d/b/a TeamHealth Hospital Medicine | § | |
| West; and AmeriTeam Services, LLC, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT
## AND REQUEST FOR DECLARATORY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs Hospital Internists of Austin, P.A. and Hospital Internists of Texas file this
Second Amended Complaint and Request for Declaratory Judgment pursuant to 28 U.S.C. §§
2201 *et seq.* complaining of Defendant Quantum Plus, LLC (f/k/a Quantum Plus, Inc.) d/b/a
TeamHealth West and d/b/a TeamHealth Hospital Medicine West; Defendant, and Defendant
AmeriTeam Services, LLC, and would respectfully show as follows:

### I. INTRODUCTION

Defendants are part of a family of companies referred to generally as "TeamHealth."
TeamHealth is in the business of providing medical staffing services to hospitals, including
providing hospitals with emergency room physicians and hospitalists. To ensure they have
sufficient medical staff for their hospital clients, TeamHealth either acquires emergency and
hospitalist groups through one of their affiliates or has one of the subsidiaries enter into supposed
independent contracts with them. In this case, a TeamHealth subsidiary entered into a Services

Agreement with Plaintiff Hospital Internists of Austin (which later subcontracted with Plaintiff Hospital Internists of Texas); however, during the performance of the contract, the TeamHealth subsidiary, with support from TeamHealth headquarters, began to and continue to exert control over Plaintiffs' hospitalists' practice of medicine in violation of the Texas law and the Services Agreement. Defendants also tortuously interfered with Plaintiffs' contractual relationships with their providers.

## II. PARTIES

1.      Plaintiff Hospital Internists of Austin, P.A. ("**HIA**") is a Texas professional association with its principal place of business located within this judicial district, at 7000 North Mopac Expressway, Suite 420, Austin, Texas 78731.

2.      Plaintiff Hospital Internists of Texas ("**HIT**") is a nonprofit corporation organized under the Texas Nonprofit Corporation Act and certified as a nonprofit health organization under the Texas Medical Practice Act, Tex. Occ. Code §162.001(b). Its principal place of business is located within this judicial district, at 7000 North Mopac Expressway, Suite 420, Austin, Texas 78731.

3.      Defendant Quantum Plus, LLC (f/k/a Quantum Plus, Inc.) d/b/a TeamHealth West and d/b/a TeamHealth Hospital Medicine West ("**Quantum**") is a foreign limited liability company organized and existing under the laws of the State of California, with its principal place of business in California. Quantum is authorized to do business in Texas, and routinely conducts business within the Western District of Texas. Quantum may be served with process by serving its registered agent for service in Travis County: Corporation Service Company d/b/a CSC–Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

2

4.     Defendant AmeriTeam Services, LLC ("**AmeriTeam**") is a foreign limited liability company organized and existing under the laws of the State of Tennessee, with its principal place of business in Tennessee. AmeriTeam conducts business in Texas but has not designated or maintained a resident agent for services of process in Texas. Pursuant to TEX. CIV. PRAC. & REM. CODE §§17.044(a)(1), 17.045, Team Health, LLC may be properly served with process by serving the Texas Secretary of State, at 1019 Brazos, Austin, Texas 78701. FED. R. CIV. P. 4(e)(1), 4(h)(1)(A).

## III. JURISDICTION & VENUE

5.     This Court has subject-matter jurisdiction over Plaintiffs' claims because there is complete diversity of citizenship between the parties and more than $75,000 in controversy. 28 U.S.C. § 1332(a)(1).

6.     This Court has personal jurisdiction over Defendants, foreign business entities, because Defendants enter into contracts, provide services, and/or routinely solicit and conduct business in the Western District of Texas. Additionally, the contract giving rise to Plaintiffs' claims was performed in the Western District of Texas.

7.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2), because the contract that made the basis of this action was executed in this district and all or a substantial part of the events or omissions giving rise to these claims occurred in the district.

## IV. FACTS

### A.     *Background*

8.      HIA is a physician-owned and physician-managed group that was founded in 1996. Over the next 20 years it grew to become the largest privately held hospitalist group in Austin with approximately 60 hospital medicine specialists. Among others, HIA historically

served all of the St. David's Healthcare Partnership, LP facilities in Austin and Georgetown (St. David's Medical Center, North Austin Medical Center, South Austin Medical Center, Heart Hospital of Austin, and St. David's Georgetown Hospital).

9.      In 2017, HIT was formed and, through a Professional Services Subcontract Agreement dated June 1, 2017, it began providing certain professional medical services on behalf of HIA, including services relevant to this case.

10.     Defendants are indirect subsidiaries of Team Health Holdings, Inc., through its various affiliates and subsidiaries, is a provider of outsourced physician staffing solutions for about one-fifth of the hospitals across the country. Team Health Holdings, Inc., along with its affiliates and subsidiaries, are collectively known as "TeamHealth." TeamHealth specializes in professional emergency department and hospitalist program services. To ensure it has talent to fulfill its duties with new hospital clients, TeamHealth-related entities solicit and acquire key physician groups in the market or alternatively, secure independent contractor service agreements. TeamHealth boasts its ability to help hospitals cut costs and allow physicians to focus on delivering care.

11.     Beginning in 2015, AmeriTeam began serving as the TeamHealth headquarters and provided legal, accounting, human resources, and/or other support services to many—if not all—of the TeamHealth subsidiaries and affiliates, including Quantum. AmeriTeam is sometimes referred to as "**TeamHealth headquarters**" herein.

**B.      *Texas Law Prohibits the Corporate Practice of Medicine***

12.     Many states have historically prohibited what is commonly known as the "corporate practice of medicine" or "CPOM." The CPOM prohibition precludes a business corporation from practicing medicine or employing a physician to provide professional medical

4

services. The rationale is that corporations practicing medicine tend to commercialize and undermine the physician-patient relationship and invade the physician's exercise of independent medical judgment, which should be in the sole interest of the patient. The practical effect of the restrictions on the corporate practice of medicine has been eroded in many jurisdictions over the years; however, Texas is one of the states that continues to maintain a broad prohibition against the CPOM with only limited statutory exceptions for certain physician employment arrangements, such as for professional associations and nonprofit health organizations.

13.     In Texas, the CPOM prohibition is codified in the Texas Medical Practice Act, TEX. OCC. CODE §151.001 *et seq.*, which prohibits non-licensed persons or entities from practicing medicine,[1] employing physicians, assisting in the unlicensed practice of medicine, sharing professional fees with licensed physicians, or otherwise engaging in the CPOM. Violation of the CPOM prohibition carries risk of both civil and criminal penalties. *See* TEX. OCC. CODE §§ 165.001–165.160.

## C.     *TeamHealth's Entrance into the Central Texas Market*

14.     In 2014-2015, at the direction of and with direct support from TeamHealth headquarters, Quantum entered the central Texas market, negotiating and entering into an exclusive Professional Services Agreement with St. David's Healthcare Partnership, LP d/b/a St. David's Round Rock Medical Center, St. David's North Austin Medical Center, St. David's South Austin Medical Center, St. David's Georgetown, Heart Hospital of Austin, and St. David's Medical Center ("St. David's PSA").

15.     Under its exclusive St. David's PSA, effective February 1, 2015, Quantum, with direct support from TeamHealth headquarters, agreed to provide emergency medicine and

---

[1]     Practicing medicine is defined in § 151.002(13) to include the diagnosis, treatment, or offer to treat a disease, deformity, or injury by any system or method.

hospitalist medicine services to the St. David's facilities. With the St. David's hospitalist PSA, Quantum became responsible for running the St. David's hospitalist program, and was charged with: directing and supervising the hospitalist services; serving as a liaison for the facilities' CEOs; conducting recruiting/orientation of hospitalists; actively leading and participating in the facilities' hospitalist committees; leading and participating in quality improvement/peer review of the hospitalist services; and facilitating and participating in regulatory compliance, professional education, planning, budgeting, and risk management as those items pertain to the hospitalist services.

16.     While negotiating the terms of its exclusive St. David's PSA, TeamHealth simultaneously negotiated with local hospitalist groups to secure the workforce needed to fulfill its anticipated contract with St. David's; specifically, (i) TeamHealth headquarters and a TeamHealth affiliate acquired Central Texas Hospitalists, P.A., a hospital medicine practice group that has historically served St. David's Round Rock Medical Center;[2] and (ii) Quantum, with support from TeamHealth headquarters and the President of the Team Health Hospital Medicine Division (Dr. Jasen Gundersen), negotiated a Services Agreement with HIA, which has historically served other St. David's facilities in Austin.

17.     TeamHealth initially wanted to acquire HIA, which was TeamHealth's preference and standard practice when entering new markets. HIA dismissed the option because it presented too much risk of compromising its physicians' independence. However, because St. David's eventually made clear its intention to use Quantum for hospitalist services, HIA had no choice but to negotiate a Services Agreement with Quantum if HIA wanted to continue serving patients

---

[2]     Central Texas Hospitalist, P.A. sued Quantum Plus, LLC and TeamHealth, Inc. for breach of the purchase agreement, breach of a guaranty, and tortious interference. *See Central Texas Hospitalists, P.A. v. Lonestar Hospital Medicine Associates, P.A., et al.,* Cause No. D-1-GN-16-000741 pending in the 98th District Court of Travis County, Texas.

at the noted St. David's facilities where HIA's physicians worked historically. HIA also believed that a services agreement preserved an appropriate arm's length relationship with Quantum and TeamHealth headquarters and would permit continued HIA independence.

18.     St. David's is highly incentivized to use TeamHealth. By using a staffing company such as TeamHealth, St. David's reduces its costs by foregoing payment of a stipend for hospitalist coverage, which it must have in steady supply to fully comply with the Emergency Medical Treatment and Labor Act (EMTALA).[3] Hospitalist stipends can cost St. David's more than $80,000 per hospitalist.

19.     St. David's expected Quantum, with TeamHealth headquarters support, to deliver additional cost-cutting (and revenue-enhancing) measures. In this sense and as explained below, St. David's used Quantum and TeamHealth headquarters to do indirectly what it could not do directly—that is, to implement a scheme of corporate governance over physicians to manipulate their medical practice to save St. David's money and remove physicians that St. David's determined cost it too much money.

### D.     Services Agreement with HIA

20.     As a consequence of the above-referenced pressures and not knowing that Quantum, with support from TeamHealth headquarters, would unlawfully perform an agreement and ignore the "independent contractor" relationship, HIA entered into a Services Agreement with Quantum on December 1, 2014, with an effective date of February 1, 2015.

21.     Soon thereafter, Quantum assigned the Services Agreement to another TeamHealth affiliate, Lonestar Hospital Medicine, P.A. ("Lonestar"), but the assignment did not

---

[3]     All hospital emergency departments, including those of St. David's, are required to comply with the EMTALA, which mandates that all patients presenting to the emergency department regardless of insurance status, receive a medical screening examination and be medically stable prior to transfer to another facility. To address these requirements, every hospital with an emergency department must have physicians on call to assist emergency physicians in assessing and treating unassigned patients.

release Quantum from liability, and representatives of Quantum continued to perform under the Services Agreement along with Lonestar. The parties amended the Services Agreement on June 1, 2016 ("First Amendment") and again September 1, 2016 ("Second Amendment"), though neither the assignment nor the subsequent amendments altered Section 2.3.1 or Section 17. Payments due under the Services Agreement were being issued by AmeriTeam.

22.     The Services Agreement on its face appeared valid, but in practice and performance, Quantum, with TeamHealth headquarters' support, began to exert unlawful control over the hospitalists' practice of medicine. The control became more clear and increased after a TeamHealth affiliate acquired Central Texas Hospitalists, P.A. ("CTH"), who were serving St. David's Round Rock facility, and CTH resisted the TeamHealth affiliate's attempted control over the CTH hospitalists. Quantum exerted such unlawful control at the behest of, in conjunction with, and/or with the consent of its client, St. David's Healthcare Partnership, LP, as well as TeamHealth headquarters.

23.     TeamHealth is not new to Texas or to the CPOM prohibition. Indeed, based at the least on prior litigation,[4] TeamHealth headquarters entity and its subsidiaries are acutely aware that the CPOM prohibition is enforced in Texas, though the Chief Operations Counsel for TeamHealth headquarters considers it an "***arcane law we call corporate practice of medicine that nobody needs***."[5] True to that apparent belief, and as explained herein, Quantum, with support from TeamHealth headquarters, violated the CPOM prohibition in practice and in the performance of the contract with HIA.

---

[4]     *See generally Cassidy v. TeamHealth, Inc.,* No. 01-08-00324-CV, 2009 WL 2231217 (Tex. App.—Houston [1st Dist.] July 23, 2009, pet. denied) (mem. op.); *American Academy Emer. V. Mem'l     Hermann Healthcare Sys., Inc.,* 285 S.W.3d 35 (Tex. App.—Houston [1st Dist.] 2009).

[5]     Deposition of TeamHealth's Chief Operations Counsel filed in support of TeamHealth's motion for summary judgment in *Central Texas Hospitalists, P.A. v. Lonestar Hospital Medicine Associates, P.A., et al.,* Cause No. D-1-GN-16-000741 pending in the 98th District Court of Travis County, Texas.

### E.    Breach of Promise to Comply in All Respects with Applicable State Statutes, Rules, and Regulations: Violation of the CPOM Prohibition

24.    Quantum promised in Section 24 of the Services Agreement to comply in all respects with applicable federal, state and local statutes, rules and regulations ("Compliance with Government Laws and Regulations Provision"). Despite these promises and the clear prohibition against CPOM in Texas, Quantum, with support from TeamHealth headquarters, engaged in the actions described below. Quantum did so at the behest of, in conjunction with, and/or with the consent of its client, St. David's Healthcare Partnership, LP, as well as TeamHealth headquarters.

### E.1.    Hiring Physicians, Staffing Decisions, Invading the Exercise of Hospitalists' Independent Medical Judgment, and Firing Physicians

25.    The Services Agreement provides in Section 2.1 that HIA has the sole authority and obligation to "select, recruit, hire" the physicians, including contract hospitalists, needed to meet the St. David's PSA as to the hospitalist medicine program and to determine necessary staffing levels in collaboration with Quantum. However, throughout the term of the Services Agreement, Quantum, with support from TeamHealth headquarters, unlawfully exercised ***control over the hiring and retention of HIA*** hospitalists and unilaterally dictated medical staffing needs at the Covered Hospitals. For instance, with support from TeamHealth headquarters:

a.    Quantum and St. David's instructed HIA not to hire physicians whom HIA was recruiting;

b.    In approximately August 2015 when HIA began transitioning its hospitalists' schedule (from a Monday-Friday and every other weekend schedule to a seven days on/seven days off schedule) and needed to add to the total of full time equivalent hospitalists on its staff, Quantum instructed HIA not to over hire; and

c.    When HIA was paid primarily by the hour, Quantum routinely instructed HIA it was "overstaffed" or "understaffed" and demanded adjustments accordingly. The Services Agreement's Exhibit A stated an expected average staffing rate of 15 to 18

patient encounters per 12 hour shift, but TeamHealth would actually instruct HIA it was overstaffed if average daily encounters were fewer than 18 per physician per shift.

26. Attempts to control HIA and its physicians did not stop with hiring practices. In approximately late 2015 Quantum, with TeamHealth headquarters' support, instructed that the HIA hospitalists would have to start *running the emergency codes on overnight shifts at St. David's South Austin Medical Center*, which was transitioning to a Level II trauma facility. The understood rationale was that a facility just getting started with Level II trauma services could not financially justify the high cost of having emergency department physicians on the overnight shift. HIA refused because in its judgment it is perilous and medically inappropriate for hospitalists to run emergency codes (especially pediatric emergency codes) since hospitalists are not trained to run emergency codes (and patients deserve the most proficient provider in emergent situations such as cardiac arrest or respiratory failure). Because Quantum's staffing instructions were such an obvious overreach and violation of the CPOM (and an issue a TeamHealth affiliate and headquarters were already fighting at St. David's Round Rock), Quantum did not press the issue further. Nevertheless, this cost-driven staffing directive demonstrates how Quantum, with support from TeamHealth headquarters, ignored the CPOM prohibition, all in an effort to serve the cost and profit goals of St. David's.

27. Additionally, at St. David's request, Quantum, with TeamHealth headquarters' support, reinforced an *"accept all" OneCall policy* that required HIA physicians to accept all transfer patients even if a specialist was needed but not first confirmed available. While it was true that HIA accepted patients for admission via the emergency department, in those instances, needed specialist were contacted first to confirm their availability. This was not the case with OneCall transfers. The policy had the net result of forcing HIA hospitalists to accept patients who needed treatment outside of the hospitalists' scope of practice.

28.     At. St. David's Health Care's request and with TeamHealth headquarters' support, Quantum also pressured HIA physicians to complete *Queries*, even though HIA physicians advised that some queries by St. David's Health Care's Clinical Documentation Improvement employees suggested or tried to lead the hospitalists to a diagnosis, which was improper and a compliance concern. This pressure necessarily infringed on HIA physician's medical judgment because only the physician can make a medical diagnosis but the message was to complete the Queries anyway. This pressure also necessarily infringed on HIA physician's medical judgment because of the additional consistent message from Defendants that if HIA wanted to work for St. David's Health Care or HCA, they had to better meet the needs of the hospital and the metrics it wanted from the hospitalists.

29.     The encroachment into the hospitalists' medical judgment occurred in other ways as well, particularly in *suggesting patients for discharge, pushing for earlier discharges, and controlling rounding to encourage faster discharges*.

(a)     For instance, during the winter months (when hospitals are often stressed with maximum patient loads), a St. David's data/administrative employee would email to Quantum a list of patients ready for discharge. The recipient would forward that email to HIA's contact physician and insist that action be taken to consider discharging the patients on the list.

(b)     Similarly, Quantum pressured HIA hospitalists to discharge patients earlier despite HIA consistently meeting the goal of 50% of anticipated daily discharges having discharge orders written by 11:00. HIA determined the bases for these requests: if the actual length of the patient's stay was exceeding the Medicare geometric mean for average length of stay for the particular patient's diagnosis, then St. David's and Quantum, with TeamHealth headquarters' support, would demand that HIA's treating hospitalist discharge the patient

(c)     At the behest of St. David's Health Care, Quantum also pressured HIA hospitalists to round their patients at South Austin Medical Center in a certain order and priority, sometimes differently than as outlined in the St. David's PSA. Dictating the order of rounding infringed on the HIA physicians' medical judgment because only the physician or his/her proper delegate has the knowledge, skill, experience, training, and

11

education to determine which patients need to be seen and when based on their clinical condition and medical needs.

This blatant infringement into the practice of medicine is yet another example of Quantum's violation of CPOM at the behest of St. David's and with the support of TeamHealth headquarters.

30.     Quantum, in conjunction with St. David's and with TeamHealth headquarters' support, also unlawfully exercised ***control over HIA's termination of its hospitalists***. Paragraph 6 of the Services Agreement provides that Quantum may with reasonable advanced notice, discussion with HIA, and opportunity for HIA to cure, "remove from service under this [Services Agreement]" any HIA-retained hospitalist deemed unsuitable for performance by a St. David's facility ("Removal Provision"). But, Quantum and TeamHealth headquarters ignored those details and allowed St. David's to dictate termination and threaten termination of physicians who cost St. David's too much money, even though the medical treatments causing such costs were— in the hospitalists' view—in the best medical interest of their patients. For example, as outlined in a December 21, 2017 cease and desist letter from HIA:

> a.     On December 4, 2017 Quantum mandated in writing HIA's removal of Dr. Paturu from St. David's Medical Center due to his patient length of stays being too long and "costing St. David's too much money," when length of stay is solely a medical judgment; and

> b.     Quantum also threatened removal of two additional hospitalists, Drs. Ayaz, and Brittain, from St. David's Medical Center for the same reason if the lengths of stay of those physicians' patients were not reduced to save St. David's money.

By engaging in those actions, Quantum and TeamHealth headquarters were invading the exercise of independent medical judgment and effectively carrying out St. David's unlawful economic credentialing practices.

### E.2.    Charge and Collect All Fees for Doctors, Fee-Splitting, and Collecting Majority of Profits

31.    In addition to exercising unlawful control over HIA's hiring and firing of hospitalists, Quantum, with TeamHealth headquarters' support, also entirely controlled every aspect of the physician fees. This control alone as outlined in the Services Agreement did not necessarily appear nefarious, but the manner in which Quantum, with TeamHealth headquarters' support, executed its billing responsibilities violated the CPOM prohibition because it allows concealment of unlawful fee-splitting and collection of the majority if not all of the profits from the physician services fees.

32.    Section 3 of the Services Agreement permits Quantum to:

- set the schedule of fees charged for the professional services furnished;
- collect the fees for HIA services;
- negotiate managed care arrangements on behalf of the physicians;
- procure requisite billing and payment authorization and enrollment numbers from applicable third-party payers;
- assume responsibility for billing patients, guarantors, and responsible parties or third party insurance carriers directly;
- independently code, bill, collect, and retain, the fees for the hospitalist services provided in the St. David's hospital medicine programs;
- own as its "sole and exclusive property" the Accounts Receivable and the Collections.

This control was balanced out in the Services Agreement by Quantum's promises to provide HIA "agreed upon" monthly billing and collection data as requested and a complete listing of all required professional documentation necessary for HIA to begin services under the Services Agreement to the St. David's facilities. HIA made repeated requests for billing and collection data and for the documentation material, which were denied and/or delayed.

33.     The breaches of promises in this regard served to:

a.     conceal the fact that Quantum and TeamHealth headquarters ignored entirely the HIA hospitalists' coding of their professional services, using it only to track physician productivity and not for billing;

13

b. on information and belief, allowed Quantum and TeamHealth headquarters to increase the average billing for HIA's services (above what the physicians' coding alone would have yielded) and conceal the fact that it is therefore necessarily splitting a physician fee with HIA;

c. on information and belief, allowed Quantum and TeamHealth headquarters to conceal the fact that they are likely splitting fees (and causing HIA to unknowingly split fees) with the emergency physician services that TeamHealth also provides under the St. David's PSA; and

d. on information and belief, allowed Quantum and TeamHealth headquarters to collect a majority of the profits generated by HIA's professional fees of HIA, particularly in conjunction with not reimbursing HIA for Total Costs Incurred as provided in Section 4 of the Services Agreement. Total Costs Incurred is defined to include costs such as recruiter fees and costs associated with securing locum tenens providers.

34. Because Quantum, with TeamHealth headquarters' support, pays HIA based on billable batches of services (some of which were provided in the same month as the payment, some in the month prior, and some for many months prior), payments owed to HIA will continue for months, if not years, after the termination date of the Services Agreement. This means that the concealment of unlawful fee-splitting and collection of the majority if not all of the profits from the physician services fees will continue for months, if not years, following termination of the Services Agreement.

## F. *Interference*

35. As HIA resisted the attempts to control the hospitalists' practice of medicine as described above, Quantum and TeamHealth headquarters began systematically drawing a wedge between HIA and its physicians, in part by soliciting HIA physicians indirectly through TeamHealth's subsidiary-recruiting company.

36. The Services Agreement contains a noninterference and nonsolicitation provision in Section 8:

14

> (b)   Noninterference. During the term of this Agreement, the parties agree that they shall not perform any of the following prohibited activities with respect to the other party's business activities: (i)   solicit or hire any person or entity who is then, or during the term of this Agreement was, an employee or contractor (including contract physicians) of the other party;   and (ii) solicit, induce, or attempt to induce any person or entity (including, but not limited to, any hospitals) doing business with the other party to terminate such relationship or engage in any other activity detrimental to the other party's business.

37.     In mid-2017, HIA was informed that HIA's retained hospitalists were being solicited to join TeamHealth. Not knowing for certain whether such information constituted rumors, but wanting to be vigilant, HIA reminded Quantum of the noninterference and non-solicitation clause in the Services Agreement and advised it to cease any such solicitations and interference.

38.     Additionally, in approximately January-February 2018, HIA learned that a TeamHealth subsidiary doing business as D & Y Staffing had been contacting HIA-retained hospitalists to solicit, encourage, and/or induce those physicians to work for TeamHealth or an affiliate. HIA also learned that TeamHealth subsidiaries began recruiting 60-70 *locums* hospitalists in and to the Austin area, presumably to work at the very facilities that HIA-retained hospitalists covered through the Services Agreement with Quantum.

39.     HIA and HIT sent Quantum a cease and desist letter to this effect on February 1, 2018 with a copy to TeamHealth headquarters and St. David's. HIA advised (again) of the noninterference and nonsolicitation provisions and of the fact that HIA and HIT physician employees and contractors were subject to a non-competition restrictive covenant which prohibits them from working, for a period of one (1) year following the termination of their employment agreements, as a hospitalist at any facility in which HIA/HIT provides services, and precludes them for working for TeamHealth or its affiliates in Travis, Williamson and Hays counties, for the same period. HIA specifically advised that the hiring of these physicians by

15

TeamHealth (or its affiliates) would cause the physicians to breach their non-competition agreements and would constitute tortious interference with contract and business relations on behalf of TeamHealth or its affiliates.

40.     Despite the above notices, TeamHealth or its subsidiaries continued to violate the noninterference and non-solicitation provision of the Services Agreement and, even as the Services Agreement came to an end, Quantum and TeamHealth headquarters continued or caused continued recruiting of HIA-retained hospitalists to work for TeamHealth in a manner that violates the above-noted non-competition restrictive covenant.

**G.     Termination of the Services Agreement and Continued Control**

41.     Quantum and TeamHealth headquarters' conduct caused the relationship between HIA and Quantum to deteriorate. On February 1, 2018, HIA was compelled to send a cease and desist letter to Quantum advising that its conduct was in breach of the noninterference provision of the Services Agreement and amounted to tortious interference. On information and belief, Quantum, and TeamHealth headquarters did not cease its offensive and predatory conduct.

42.     Given the untenable relationship and the commensurate risk to HIA physicians, on February 8, 2018, HIA gave notice of termination of the Services Agreement, effective June 8, 2018, and files this suit for damages and injunctive relief.

43.     Subsequently, in late March 2018, Quantum made it clear that TeamHealth had been accessing HIA's billing and medical record documentation for assigned patients that are outside the scope of services covered by the Services Agreement. HIA provided written notice to Quantum that such conduct at the very least violates the Health Insurance Portability and Accountability Act ("HIPAA").

### H.      Total Costs Incurred

44.      The Services Agreement provides that Quantum will reimburse HIA for its Total Costs Incurred in fulfillment of its obligations to Quantum prior to June 2016. Quantum has failed to pay and failed to confirm that it will make payment of $2,626,810 in Total Costs Incurred for recruiting commissions, locums retentions, and contract labor costs. Even estimating payments from Defendants for D&Y locums' professional fees, if appropriate or required, a conservative total owed for Total Costs Incurred is at least $1,432,133.

## V.  CAUSES OF ACTION

### COUNT ONE: REQUEST FOR DECLARATORY JUDGMENT –
### HIA V. QUANTUM AND AMERITEAM

45.      Plaintiff HIA hereby incorporates paragraphs 1 through 44 the same as if fully set forth verbatim herein.

46.      With TeamHealth headquarters' support, Quantum's performance of the Services Agreement has resulted in and will continue to result in or subject Plaintiffs to unlawful control over the billing, collection, and distribution of fees for Plaintiffs' professional services and unlawful fee-splitting in violation of Texas law, including Texas Medical Practice Act, as codified at TEX. OCC. CODE §151.001 et seq.

47.      There is a substantial controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory action from this Honorable Court.

48.      A significant possibility of future harm to Plaintiffs exists, and actual present harm exists. Though the term of the Services Agreement expired on June 8, 2018 (after the Original Complaint was filed), Defendants actions thereunder will continue to occur for months, if not years, because Quantum, with TeamHealth headquarters' support, pays HIA based on billable batches of services (some of which were provided in the same month as the payment,

some in the month prior, and some for many months prior). This means that the unlawful control over the billing, collection, and distribution of fees for Plaintiffs' professional services and concealment of unlawful fee-splitting will continue for months, if not years, following termination of the Services Agreement.

49.     At all times mentioned herein, Quantum was not licensed to practice medicine in Texas and may not permissibly exercise control, directly or indirectly, over a medical practice or enter into arrangements that are tantamount to the unlicensed practice of medicine, including fixing, collecting, and controlling all aspects of fees generated from HIA and HIT providers services under the Services Agreement.

50.     HIA brings this cause of action pursuant to 28 U.S.C. § 2201 *et seq*. and seek a declaration from the Court that:

> HIA has a legal right to lawful payment for all professional services performed by HIA-retained physicians (including HIT physicians) actually rendered under the Services Agreement, meaning payment that does not involve fee-splitting.

### COUNT TWO (IN THE ALTERNATIVE): BREACH OF CONTRACT – HIA V. QUANTUM

51.     Plaintiff HIA hereby incorporates paragraphs 1 through 50 the same as if fully set forth verbatim herein.

52.     HIA is a party to a valid and enforceable contract with Quantum.

53.     HIA fully or substantially performed its obligations under the Services Agreement by providing high quality medical care to patients at the noted St. David's facilities throughout the term of the Services Agreement.

54.     Quantum interfered with HIA's obligations and rights under the Services Agreement to select, hire, and contract with physicians. Quantum also demanded removal of physicians from the Services Agreement for reasons outside those listed in the <u>Removal</u>

Provision and in any event without notice or an opportunity to cure. Quantum's failures constitute a material breach of its obligations as set forth in the Removal Provision of the Services Agreement.

55.     Quantum's execution of the Services Agreement—exercising control over physician hiring, staffing, and firing; the invasion of medical judgment regarding the timing of patient discharges from St. David's facilities and the directive to run codes on the overnight shift at one of the facilities; imposing the "accept all" OneCall policy; pressuring HIA physicians to answer Queries that suggested a diagnosis; pressure to discharge patients; comprehensive control over billing and collection; and fee-splitting—has resulted in the corporate practice of medicine in violation of Texas law, including the Texas Medical Practice Act, as codified at TEX. OCC. CODE §151.001 *et seq.* Quantum's conduct represents a failure to comply in all respects with applicable federal, state, and local statutes, rules and regulations, and therefore constitutes a material breach of its obligations set forth in the Compliance with Government Laws and Regulations Provision of the Services Agreement.

56.     Quantum has failed to compensate and failed to confirm that it will compensate HIA for Total Costs Incurred related to the performance of the HIA's obligations under the Services Agreement. Quantum's failure constitutes a material breach of its obligations as set forth in the Compensation Provision of the Services Agreement with HIA.

57.     As a proximate result of the breach and breach of the non-solicitation provision, HIA sustained actual damages that were a natural, probable, and foreseeable consequence of the breaches. HIA is entitled to all foreseeable damages resulting from Quantum's material breaches of the Services Agreement, including actual damages.

### COUNT THREE: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS – HIA AND HIT V. QUANTUM AND AMERITEAM

58.     Plaintiffs HIA and HIT hereby incorporate paragraphs 1 through 57 the same as if fully set forth verbatim herein.

59.     HIA's contract hospitalists (HIT employees) are subject to a non-competition restrictive covenant which prohibits them from working, for a period of one (1) year following the termination of their employment agreements, as a hospitalist at any facility in which HIA and HIT provides services, and precludes them for working for TeamHealth or its affiliates in Travis, Williamson, and Hays counties, for the same period. TeamHealth is on notice that these non-competition restrictive covenant agreements are in place.

60.     Additionally, while the Services Agreement was in effect, Section 8(b) of the Service Agreement prohibited TeamHealth from soliciting, inducing, or attempting to induce any person or entity doing business with HIA to terminate such relationship or engage in any activity that will cause substantial and irreparable harm to the other party's business. TeamHealth directly or indirectly engaged in such actions despite being advised that HIA's employees and contractors are subject to applicable non-competition restrictive covenants. TeamHealth also began recruiting 60-70 locums hospitalists in and to the Austin area, presumably to work at the very facilities that HIA covers through the Services Agreement with TeamHealth.

61.     TeamHealth willfully and intentionally interfered with the continuing relationships between HIA and its retained physicians by soliciting doctors from HIA and HIT.

62.     At all times relevant hereto, TeamHealth acted intentionally, with malice, and with the specific purpose of interfering with HIA's contracts with its employees and contractors. TeamHealth's intentional and tortious interference entitles HIA to recovery of exemplary damages.

20

63.     HIA and HIT sustained actual damages as a result of TeamHealth's conduct, including at least the cost and distraction from ordinary business, of obtaining legal advice, and sending cease and desist notices.

## VI.  CONDITIONS PRECEDENT

64.     All conditions precedent have been performed, excused, waived, or otherwise satisfied.

## VII.  ATTORNEYS' FEES

65.     Plaintiffs hereby incorporate paragraphs 1 through 64 the same as if fully set forth verbatim herein.

66.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009 and § 38.001, *et seq.*, Plaintiffs are entitled to recovery of their reasonable and necessary attorneys' fees. Plaintiffs respectfully request that the Court award Plaintiffs their costs and reasonable and necessary attorneys' fees expended in this matter.

## VIII.  JURY DEMAND

67.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby request a trial by jury on the merits.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants be cited to appear and answer and that upon final hearing, a judgment be entered in favor of Plaintiffs declaring the rights, and legal relations of the parties as set forth above, awarding Plaintiffs actual damages, pre and post-judgment interest at the maximum permissible rate at law or in equity, its costs of court and reasonable and necessary attorneys' fees incurred or

Case 1:18-cv-00466-RP   Document 91   Filed 08/14/19   Page 22 of 23

the preparation and trial of this case and for any appeal, and such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

By: */s/ Lorinda Holloway*              
Lorinda Holloway
State Bar No. 00798264
Lorinda.Holloway@huschblackwell.com
Kevin Koronka
State Bar No. 24047422
Kevin.Koronka@HuschBlackwell.com
Danielle Gilbert
State Bar No. 24092421
Danielle.Gilbert@HuschBlackwell.com

HUSCH BLACKWELL, LLP
One Congress Plaza
111 Congress Avenue, Suite 1400
Austin, Texas  78701-4093
Telephone:  (512) 472-5456
Telecopier:  (512) 479-1101

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that the foregoing document was served upon all counsel of record via the Court's CM/ECF electronic filing system in accordance with the Federal Rules of Civil Procedure on August ___, 2019.

/s/ *Lorinda Holloway*
Lorinda Holloway

John C. Dunne
jdunne@smfadlaw.com
George A. Shannon
gshannon@smfadlaw.com
Adam C. Kiehne
akiehne@smfadlaw.com
SHANNON, MARTIN, FINKELSTEIN, ALVARADO & DUNNE
A Professional Corporation
1001 McKinney Street, Suite 1100
Houston, TX 77002
(713) 646-5500 (Phone)
(713) 752-0337 (Fax)

**ATTORNEYS FOR QUANTUM PLUS, LLC
D/B/A TEAMHEALTH HOSPITAL MEDICINE
WEST AND TEAM HEALTH, LLC**